# IN THE COURT OF APPEALS OF IOWA

No. 17-0637
Filed May 2, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROBERT ARTHUR DAVIS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Muscatine County, Gary P. Strausser, District Associate Judge.

Robert Davis appeals his conviction of operating while intoxicated, second offense. **AFFIRMED.**

Kent A. Simmons, Bettendorf, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Considered by Danilson, C.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Robert Davis appeals his conviction of operating while intoxicated, second offense, contending the district court erred in partially denying his motion to suppress evidence. He specifically argues his statutory rights under Iowa Code section 804.20 (2015) were violated and such violation requires suppression of the chemical breath test he provided to law enforcement following his arrest.

## I.    Background Facts and Proceedings

The following facts can be gleaned from the suppression record. At approximately 10:30 p.m. on February 25, 2015, Muscatine County Sheriff's Deputy Edward Cardenas responded to a motor vehicle collision. In his testimony at the suppression hearing, Cardenas characterized the weather conditions prevailing at this time as follows: "It was . . . actively snowing. There was about two to three inches of snow on the ground. It was very hard to see. It was slippery, cold." A review of the footage recorded on Cardenas's squad car recording device supports this assessment.

After arriving on the scene, Cardenas made contact with the occupants of one of the vehicles involved in the collision, Davis and his wife. The Davises were seated together in the back seat of their vehicle when Cardenas approached. While speaking with the couple, Cardenas noticed a slight odor of alcohol emanating from inside the vehicle. Cardenas subsequently concluded the odor of alcohol was coming from Davis upon speaking to him individually outside the vehicle. While Davis was receiving attention from emergency medical technicians in an ambulance, his wife advised Cardenas that Davis was driving the vehicle at the time of the collision and she and Davis had recently consumed alcohol with

their dinner. Cardenas then spoke with Davis in the ambulance, who admitted he consumed "about three drinks," consisting of "rum and Coke." Cardenas observed Davis's "red, bloodshot, watery eyes," which prompted Cardenas to perform a horizontal-gaze-nystagmus test. Davis exhibited "six signs of impairment out of six possible signs." Cardenas advised Davis he suspected him of driving while under the influence and stated his desire to perform further testing. Due to the prevailing weather conditions, Cardenas advised Davis he would need to transport him to the local jail in order to perform the testing in a controlled environment. Davis directed his wife to contact his attorney. At approximately 10:57 p.m., Cardenas placed Davis in the back seat of his squad car.[1] At this time, Davis was read his *Miranda* rights, but he was not placed in handcuffs. Shortly after being placed in the squad car, Davis asked Cardenas, "Can I talk to my wife before we leave?" Cardenas responded, "Once we are done you can, not right now." Thereafter, Cardenas retrieved Davis's cell phone from his wife, which Cardenas placed in his pocket, and advised Davis's wife he was transporting Davis to the jail. Cardenas returned to his squad car and transported Davis to the jail. While in transit, Cardenas advised Davis:

> I have your cell phone, it's in my pocket, and I will give that to you as soon as we get down to the jail. And basically what we are going to do at the jail is we are using it for their garage, so we can be outside this weather so I can do a couple more tests on you, give you an opportunity to complete those tests, and we can go from there, okay? And if we determine that we don't need to go further, then I can bring you back to your residence.

---

[1] Cardenas activated the audio and video recording systems in his squad car at the time he placed Davis therein. The recording was admitted as an exhibit at the suppression hearing.

Later in the trip, Davis's cell phone began to ring, upon which Cardenas advised, "If that's your phone ringing, I'll give it to you in a second when we get to this facility." Davis responded, "Okay, it sounded like one of my ringtones." At no point during the trip from the scene of the collision to the jail did Davis request his cell phone to call his wife or an attorney.

Cardenas and Davis arrived at the jail at roughly 11:14 p.m., parking the squad car in the jail's "sally port," or garage, where the testing was to be administered. Cardenas had Davis perform two standard field sobriety tests in the sally port. At approximately 11:23 p.m., as a result of Davis's performance on the field sobriety tests, Cardenas advised Davis he was under arrest for driving while under the influence and escorted him from the sally port to the jail's "intake room," which is located immediately adjacent to the sally port.[2] Thereafter, at 11:25 p.m., while in the intake room, Cardenas advised Davis:

> The Iowa state law 804.20 . . . requires me to give you an opportunity to make a phone call to whoever you please, and let them know anything you want them to know. So as of right now you have the opportunity to make a phone call to whoever you need to, and talk to them if you need to.

Davis called his wife first, advised he was being processed, and directed her to contact his attorney. After this call concluded, Cardenas questioned Davis whether he had any other calls he would like to make. At 11:32 p.m., Davis made contact with his attorney, Greg Johnston, and advised him of the situation. After speaking to Johnston, Davis advised Cardenas he would not say or sign anything or answer any questions until Johnston was present. Cardenas proceeded to read Davis the

---

[2] An audio and video recording of the happenings in the intake room was also admitted as an exhibit at the suppression hearing.

implied-consent advisory and requested Davis to submit to a chemical breath test. Cardenas ultimately allowed Davis to wait to decide whether to submit to the test until his attorney arrived. Johnston subsequently arrived at the jail and was given an opportunity to speak with Davis outside of Cardenas's presence, but within his sight, after which Davis agreed to submit to a chemical breath test. The test resulted in an alcohol concentration of .128.

Davis was charged by trial information with operating while intoxicated, second offense. Davis filed a generic motion to suppress on reasonable-suspicion grounds. Davis subsequently filed an amended motion to suppress contending his statutory right to communicate with counsel or a family member under Iowa Code section 804.20 was violated prior to his submission to field sobriety testing. He requested suppression of evidence concerning the field sobriety tests and, additionally, evidence concerning his chemical-breath-test result, alleging such evidence was "fruit of the poisonous tree."

Following a hearing on the motion to suppress, the district court concluded Davis's section 804.20 rights were violated before he performed field sobriety testing because Davis "was clearly being detained for the purpose of sobriety testing and was denied an opportunity to call his wife." The court therefore ordered the suppression of any evidence relating to the field sobriety testing. However, the court also concluded "[t]he State's misconduct by violating Iowa Code Section 804.20 ended when [Davis] was allowed to consult his wife by phone and his attorney in person" and "[f]rom that point forward there was no violation of Iowa Code Section 804.20." The court therefore declined to suppress the evidence concerning Davis's chemical breath test.

Davis subsequently waived his right to a jury trial and the matter was submitted to the court upon exhibits and the minutes of evidence. The court found Davis guilty as charged. Davis appealed following the imposition of judgment and sentence.

## II.     Standard of Review

"The district court's interpretation of Iowa Code section 804.20 is reviewed for errors at law." *State v. Hellstern*, 856 N.W.2d 355, 360 (Iowa 2014) (quoting *State v. Walker*, 804 N.W.2d 284, 289 (Iowa 2011)); *accord State v. Lyon*, 862 N.W.2d 391, 394 (Iowa 2015). "We will affirm a district court's ruling on a motion to suppress when the court correctly applied the law and there is substantial evidence to support the court's fact-finding." *Lyon*, 862 N.W.2d at 394.

## III.     Discussion

Davis contends the district court "erred in denying suppression of the breath test result because . . . [he] made the decision to submit to the breath test as a direct result of the violation of his statutory right to consult with his attorney before the field tests." He argues, had Cardenas not violated his section 804.20 rights prior to field sobriety testing, then the advice he would have received from his counsel concerning whether to submit to a chemical breath test would have been different—his attorney would have advised him to decline to take the test.[3] He therefore contends his decision to submit to a chemical breath test was a direct or

---

[3] At the suppression hearing, Johnston testified that, had he had the opportunity to speak with Davis earlier in the foregoing course of events, he would have advised him to not submit to a horizontal-gaze-nystagmus test or any field sobriety testing and "probably would have recommended that he decline to take" a chemical breath test. He further testified that, by the time he was able to speak with Davis, he learned Davis had already failed field sobriety testing. According to Johnston, but for Davis's prior submission to field sobriety testing, he would have advised him to decline a chemical breath test.

indirect result of the earlier violation of his statutory rights and such evidence must be suppressed under the exclusionary rule.

Iowa Code section 804.20 provides, in relevant part, the following:

Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney.

As a preliminary matter, the earliest possible time Davis's section 804.20 rights could have triggered was when he and Cardenas arrived at the jail at 11:14 p.m. *See State v. Smith*, No. 16-0749, 2017 WL 510957, at *2 (Iowa Ct. App. Feb. 8, 2017); *State v. Serrine*, No. 15-1496, 2017 WL 108290, at *8 (Iowa Ct. App. Jan. 11, 2017) ("The . . . right to call or consult arises *after arrival* at the place of detention. To 'arrive' at a place, one must come from somewhere else. In the present context, that somewhere else was the place where Serrine's liberty was first restrained—the scene where she was stopped. She arrived at the jail. It necessarily and logically follows that her right to make a call or have a consultation did not arise until after she arrived at the jail.").

Furthermore, mere weeks before Davis was arrested for operating while intoxicated in this matter, our supreme court stated that, despite the "language in Iowa Code section 804.20 that seems to suggest a broad application"—"any person arrested or restrained of the person's liberty for any reason whatever"—"Iowa Code section 804.20 applies to the period after arrest but prior to the formal commencement of criminal charges." *State v. Robinson*, 859 N.W.2d 464, 486–87 (Iowa 2015). The court noted "the statute must be interpreted in context," and

recognized "Iowa Code chapter 804 generally deals with the commencement of criminal actions and arrests." *Id.* The court also pointed out the proverbial writing on the wall, recognizing "[t]he title of Iowa Code section 804.20 is 'Communications by arrested persons.'" *Id.* at 487.

Although Davis was being detained for further investigation when he arrived at the jail, he was not yet under arrest. *Cf. Smith*, 2017 WL 510957, at *1–2 (concluding, although defendant was detained for further investigation when officers transported him to police station for field sobriety testing "because field conditions presented safety concerns" for such testing, he was not yet under arrest for purposes of section 804.20); *State v. Delzer*, No. 15-1737, 2016 WL 3276944, at *3 (Iowa Ct. App. June 15, 2016) (concluding request to call attorney prior to field sobriety testing was premature where, due to inclement weather, officer transported defendant to sheriff's department to conduct field sobriety testing because officer "had not yet made a decision to arrest [Delzer] and had not even completed the investigatory portion of the traffic stop." (alteration in original)). As part of the further investigation, Cardenas requested Davis to perform standard field sobriety tests, and Davis complied. *See State v. Krebs*, 562 N.W.2d 423, 426 (Iowa 1997) ("Field sobriety tests are used by peace officers to determine whether there are reasonable grounds to believe a person is intoxicated. These tests are part of an officer's investigation to determine if a criminal offense has occurred. At this point in the investigation, the defendant is merely being detained by the officer, not restrained of his liberty.").[4] It was not until approximately 11:23 p.m., after

---

[4] We find the supreme court's subsequent decision in *State v. Moorehead*, 699 N.W.2d 667 (Iowa 2005) distinguishable. In *Moorehead*, the defendant "had already failed three

Davis's failure of the field sobriety tests, that he was placed under arrest. Without any delay, let alone an unnecessary one, Cardenas immediately took Davis to the intake room and advised him of his section 804.20 rights, which Davis exercised by contacting his wife and an attorney.

As noted, the district court suppressed the evidence concerning the field sobriety tests on the ground that Davis's section 804.20 rights were violated before he performed the tests because Davis "was clearly being detained for the purpose of sobriety testing and was denied an opportunity to call his wife." We agree that Davis was being detained for the purpose of field sobriety testing and that he was denied an opportunity at the scene of the accident to communicate with his wife. We find, however, that Davis's section 804.20 rights were not triggered until the completion of the field sobriety testing, which is the point in time that the investigatory stage of the traffic stop concluded. The field sobriety tests therefore should not have been suppressed as having been conducted in violation of Davis's section 804.20 rights. Furthermore, upon the completion of the field sobriety testing, Cardenas placed Davis under arrest, immediately advised him of his section 804.20 rights, and allowed him to exercise the same prior to his decision to submit to a chemical breath test, all in compliance with section 804.20.

---

field sobriety tests, a preliminary breath test, arguably made an incriminating statement, . . . displayed many symptoms of drunkenness" and "[t]he deputy himself testified that he considered Moorehead 'technically' under arrest after he failed the field sobriety tests." 699 N.W.2d at 671. Under those circumstances, the supreme court concluded "[t]he investigatory stage of the stop had ended" and "Moorehead was not going anywhere." *Id.* This case is not similar to *Moorehead* because the investigatory stage of the traffic stop was not completed until after Davis completed field sobriety testing. We found *Moorehead* distinguishable for the same reason in *Delzer*, 2016 WL 3276944, at *3.

Because Davis's statutory rights under Iowa Code section 804.20 were not violated, he was not entitled to suppression of the chemical breath test. We therefore affirm his conviction.

**AFFIRMED.**